Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK, L.L.P.
777 Main Street, Suite 1550
Fort Worth, Texas 76102
Phone: (817) 877-8855
Fax: (817) 877-4151
jprostok@forsheyprostok.com
llankford@forsheyprostok.com

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | CHAPTER 11 CASES |
|  | ) |  |
| NGV GLOBAL GROUP, INC., | ) | CASE NO. 22-42780-MXM-11 |
|  | ) |  |
| NATURAL GAS VEHICLES TEXAS, INC. | ) | CASE NO. 22-42781-MXM-11 |
|  | ) |  |
| NATURAL GAS SUPPLY, LLC | ) | CASE NO. 22-42782-MXM-11 |
|  | ) |  |
| NATURAL GAS LOGISTICS INC., | ) | CASE NO. 22-42783-MXM-11 |
|  | ) |  |
| DEBTORS. | ) | **Hearing: Nov. 22, 2022 @ 2:30 p.m.** |
|  | ) |  |
|  | ) | **Joint Administration Pending** |
|  | ) |  |

**DECLARATION OF FARROUKH ZAIDI IN SUPPORT OF FIRST DAY MOTIONS**

I, Farroukh Zaidi, state and declare as follows:

1.      I am over 18 years of age, of sound mind, and fully competent to make this Declaration.  If called upon to testify, I could and would competently testify to the matters set forth herein.

2.      I am the Chief Executive Officer (CEO) of NGV Global Group, Inc. ("NGV Global"), natural Gas Vehicles Texas, Inc. ("NGV Texas"), Natural Gas Supply, LLC ("NGS") and Natural Gas Logistics Inc. ("NGL", and collectively with NGV Global, NGV Texas and NGS, the "Debtors"

or the "<u>Companies</u>").  In that capacity, I am the authorized representative of the Debtors in these bankruptcy cases.

3.    Based upon my personal knowledge of the Debtors and their business operations, ownership, history, industry, and book and records, and based upon information contained in the Debtors' books and records, I am qualified to make this Declaration on behalf of the Debtors. Some of the information contained herein is based upon my review of data regularly compiled by the Debtors in the ordinary course of its business.

4.    This Declaration is being submitted to give an overview of the Debtors' businesses, their reasons for filing these chapter 11 cases and in support of the facts in the Debtors' First-Day Motions (collectively, the "<u>Motions</u>")[1], including:

a.    *Debtors' Motion for Entry of an Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of Cases for Procedural Purposes Only* [Docket No. 4] (the "<u>Joint Administration Motion</u>");

b.    *Debtors' Emergency Motion for Order (I) Authorizing the Debtors to Fund Intercompany Obligations for Prepetition Wages, Payroll Taxes, and Other Employee-Benefit Obligations, or Alternatively, to Pay or Honor Pre-Petition Obligations to Certain Critical Vendors, and (II) Directing Banks to Honor Checks Issued to Fund Pre-Petition Wages and Holdings* [Docket No. 7] (the "<u>Wage Motion</u>");

c.    *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors; and (II) Granting Related Relief* [Docket No. 8] (the "<u>Critical Vendor Motion</u>"); and

d.    *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Granting Adequate Protection* ("<u>Cash Collateral Motion</u>") [Docket Nos. 5 and 6] (the "<u>Cash Collateral Motion</u>")

## **ABOUT THE COMPANIES**

5.    The Debtors operate as part of a related group of global technology companies that design, manufacture, distribute and support natural gas operated medium and heavy-duty commercial vehicles sold worldwide.  The companies convert vehicles to compressed natural gas

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the applicable Motions.

engines, refurbish and service existing class 8 vehicles powered by natural gas engines and fueling systems for application in their own motor transportation business and for sale to third party companies interested in the conversion of trucks and buses to operate on natural gas. The companies are among the largest privately held natural gas logistics companies in the United States. As a group, the companies employ over 240 mechanics, driver, and logistics professionals specializing in CNG vehicles.

6.       NGV Global is the parent holding company for the other three (3) Debtors, as well as several non-debtor entities. NGV Global was founded in 2019 as a Delaware corporation and later reincorporated as a Nevada corporation. NGV Global's business objective is focused on capturing the synergy of several complimentary businesses in the natural gas segment that can work together efficiently to advance overall performance. This collaboration of entities mitigates risks typically associated with operating in the alternative fuel space by creating a structure that not only allows the group to sell products to the marketplace, but also financially benefit from the operational advantages of products produced.

7.       NGV Texas is a Texas corporation that provides compressed natural gas (CNG) conversions and servicing options for small and mid-size businesses, government, and major corporations to help them reduce their carbon footprint. NGV Texas is one of the most technologically advanced CNG conversion experts in the United States. NGV Texas specializes in CNG conversion of all classes of vehicles, including Class 8 diesel trucks, box trucks, trailers, school busses, fleet vehicles, vans, and passenger vehicles. This process allows vehicles to either transition to natural gas completely, or to a dual-fuel system allowing the vehicles to use natural gas simultaneously with traditional fuels such as diesel or gasoline.

8.       NGS is a Texas limited liability company that provides high-pressure cryogenic fuel logistics services to a variety of clients in the industrial/manufacturing and power generation industries. NGS is the premier carrier of CNG, Liquified Natural Gas (LNG) and Hydrogen (H2) in

the Southwest market.  NGS is licensed and equipped to haul CNG/LNG/H2 and other high pressure and cryogenic gasses all across the 48 states of the continental USA.

9.      NGL is a Texas corporation that operates as one of the largest privately-owned 100% alternative fuel transportation companies in the United States.  NGL provides a range of logistics services, including dedicated truckload, less-than-truckload, mail/e-commerce, rock hauling, expedited and intermodal/drayage, and its customer base includes Amazon, PepsiCo, Hobby Lobby, UPS, and the USPS.  The transportation industry is among the largest contributors to greenhouse gas emissions, and NGL helps its customers reduce carbon emissions by up to 85% and improve environmental, social, and governance scores.  The NGL fleet consists of medium and heavy-duty commercial alternative fuel vehicles, including CNG, renewable natural gas (RNG), and hybrid electric vehicles.

10.      In 2019 and 2020, the Debtors entered into a series of sale-leaseback transactions with Mike Albert, Ltd. ("MAL") pursuant to various Master Lease Agreements and related agreements (the "Leases").[2]  Pursuant to these transactions, MAL purchased from NGV Texas over 600 vehicles and then leased those same vehicles back to NGS and NGL.  The purpose of the sale-leaseback transactions was to expand the NGV Global companies' logistics business using cost effective CNG fuel as a competitive advantage.

11.      Shortly after the sale-leaseback transactions, the COVID pandemic brought the world economy to a halt and delayed the Debtors' plan to deploy vehicles and build their logistics business.  As of the Petition Date, approximately 170 vehicles out of the 600 vehicles subject to the Leases with MAL are being used in the Debtors' logistics business and are revenue producing. As a result of the COVID pandemic delaying the Debtors ability to launch and develop its logistics and other businesses, the Debtors have not been able to generate sufficient revenue and revenue

---

[2] The Debtors specifically reserve the right to contend that the Leases are secured transactions rather than true leases.

quality to meet its payment obligations under the Leases.  MAL commenced litigation against the Debtors seeking to recover amounts due under the Leases or to repossess the vehicles.

12.    These bankruptcy cases were filed to allow the Debtors an opportunity to address the issues raised in the MAL litigation and to develop a business strategy to reduce costs, streamline operations, concentrate business around customers with sufficient rates, restructure and negotiate creditor obligations so that they may emerge from bankruptcy as viable enterprises going forward.

<u>**THE JOINT ADMINISTRATION MOTION**</u>

13.    The Debtors are affiliates of each other in that NGV Texas, NGS, and NGL are the wholly-owned subsidiaries of NGV Global.

14.    In my opinion, the joint administration of the Debtors' chapter 11 cases will expedite the administration of these cases and reduce administrative expenses without prejudicing any creditor's substantive rights.  I anticipate that numerous notices, applications, motions, other pleadings and orders in these cases will affect both of the Debtors.  Based on my understanding, the joint administration of the cases will permit counsel for all parties in interest to include the Debtors' respective cases in a single caption on the documents that will be filed and served in these cases, and will enable parties in interest in both of the above-captioned chapter 11 cases to be apprised of the various matters before the Court in both of these cases.

15.    I further understand that the entry of an order of joint administration will: (a) significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court; (b) simplify for the Office of the United States Trustee the supervision of the administrative aspects of these chapter 11 cases; (c) render the completion of various administrative tasks less costly; and (d) minimize the number of unnecessary delays associated with the administration of separate chapter 11 cases.

16.    I understand that the Joint Administration Motion does not seek to substantively consolidate the cases.  Thus, I do not believe the rights of parties in interest will be prejudiced by

the proposed joint administration of these cases because each creditor may still file its claim against a particular estate.  In therefore believe that joint administration of the above-captioned cases is in the Debtors' best interest, as well as those of their respective estates, creditors and other parties in interest.

## THE WAGE MOTION

17.    The Wage Motion relates to funding of pre-petition payroll and other employment related obligations earned by the Debtors' workforce.

18.    The employees making up the Debtors' workforce are not technically employed by any of the Debtor entities.  All individuals are employed by an affiliated non-debtor entity, NGV Administrative and Human Resources, Inc. ("NGV HR"). The Debtors are responsible for funding payroll for the employees.

19.    The Debtors seek the authority to provide funds to NGV HR for the following: (a) pre-petition wages, and salaries for the employees working for the Debtors in the total amount of approximately $451,917.00 in net wages, including any amounts owed for recently used holiday, vacation, or sick leave pay; (b) approximately $98,904.95 in payroll taxes; (c) approximately $3,170.70 in employee garnishment; (d) approximately $43,409 in health and welfare insurance premium; (e) approximately $39,238 in 401(k) plan deferral and matching; and (f) permit employees to use post-petition paid time off, holidays, and sick leave days that they accrued pre-petition (collectively, the "Pre-Petition Workforce Obligations").  The wages or salaries the Debtors seek to fund for the employees will not exceed the $13,650 cap under section 507(a)(4)(A) of the Bankruptcy Code for any individual employee.

20.    The continued loyalty of the Debtors' workforce is a necessary component for a successful reorganization.  Under the best of circumstances, the filing of a chapter 11 petition is a stressful and uncertain time for a debtor's employees, most of whom are not familiar with the nuances that bankruptcy practitioners often take for granted.  Such stress and uncertainty is causing poor employee morale at this time when the Debtors need workforce to be most loyal.

Moreover, many employees live paycheck to paycheck and will suffer immediate adverse consequences if they fail to receive their full compensation.

21.     Honoring the Pre-Petition Workforce Obligations will minimize the hardship that employees will certainly endure if compensation or benefits are interrupted and will provide comfort to the Debtors' workforce that the reasonable expectations of compensation for services will be met.  As such, the Debtors seek to continue funding the Pre-Petition Workforce Obligations in the ordinary course.

22.     The relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.  A failure by the Debtors to honor Pre-Petition Workforce Obligations to employees may result in the loss by the Debtors of their workforce at a time when they need them most.  Consequently, it is essential to the Debtors' continued operations that employees receive assurance that they will receive all pre-petition compensation without interruption

## A.     THE DEBTORS' WORKFORCE

23.     As noted above, the Debtors do not employ any employees. Instead, a separate, affiliated, non-debtor entity, NGV HR, employs all of the Debtors' workforce.  Certain of the employees, such as drivers and mechanics, are dedicated to one Debtor entity and thus the payroll associated with such dedicated employees are the obligations of the particular Debtor such employees are dedicated to.  Separately, the executive team and accounting/administrative personnel serve all of the Debtors and thus each of the Debtors are allocated, and share, a portion of the payroll obligations owed to the executive and accounting/administrative personnel (the "Corporate Overhead").

24.     The Debtors each fund their individual aggregate share of the Corporate Overhead as well as the payroll, payroll taxes, and other workforce obligations for the dedicated employees that are used by each individual company.

### (a)     NGV Global's Workforce

25.     NVG Global has fourteen (14) full-time employees consisting of accounting staff,

officers, human resource personnel, and other administrative employees (the "NGV Global Employees"). The NGV Global Employees service the Debtors and non-debtor affiliates, and their wages/salaries make up the Corporate Overhead.

**(b)     NGV Texas' Workforce**

26.     NVG Texas has forty-two (42) full-time dedicated employees including mechanics, production workers, parts handlers, and supervisors  (the "NGV Texas Employees").

**(c)      NGS' Workforce**

27.     NGS has five (5) part-time dedicated employees including four (4) over the road drivers paid by the hour and one (1) over the road drivers paid by the dispatched mile (the "NGS Employees").

**(d)     NGL's Workforce**

28.     NGL has one hundred-thirty three (133) full-time dedicated employees consisting of drivers (the "NGL Employees" and collectively with the NGV Global Employees, NGV Texas Employees, and NGS Employees, the "Employees").

**(e)     Employee Benefit Programs**

29.     NGV HR provides full-time Employees completing thirty (30) days of employment with health insurance through Aetna and additional voluntary benefits through GIS Benefits and telemedicine benefits through Fresh Benefits. Likewise, the 401(k) program is only available to full-time Employees completing thirty (30) days of employment and is administered by Nationwide. Lastly, NGV HR also provides paid Federal holidays to all Employees equal to five (5) days. Vacation pay is also provided to Employees that have been employed for 90 days and have worked the last scheduled day prior to the holiday and the first scheduled shift after the holiday. No Employees received paid sick leave.

**B.     THE DEBTOR'S PAYROLL PROCESS**

30.     The payroll cycle for the Employees is as follows:

a.     Drivers who are employed by NGL and primarily service NGL's business with the U.S. Postal Service are paid on a weekly basis every Tuesday.

Payroll covers a 7-day Sunday-Saturday period. For example, for payroll scheduled for November 22nd, the 7-day pay period covered will be Sunday November 6 through Saturday, November 12 (the "U.S. Mail Payroll");

b.    Drivers employed by NGL not servicing the U.S. Postal Service are referred to as "Driver Group 2." This group is paid on a weekly basis every Thursday. Payroll paid on Thursdays covers the period of the prior Sunday-Saturday, i.e. payroll scheduled for November 24th covers the period of Sunday, November 13th through Saturday, November 19th (the "Driver Group 2 Payroll");

c.    The drivers employed by NGS and the remaining non-driver Employees, are paid on a bi-weekly basis every other Friday. Payroll paid every other Friday covers the period of the prior two weeks (i.e. payroll distributed on November 18th covered the period of Sunday, October 30 through Saturday, November 12 (the "Non-Driver Payroll").

Henceforth, the Debtors will continue to pay Employees on the above-listed schedule.

31.    On November 18, 2022, the Debtors terminated the employment of thirty-eight (38) Driver Group 2 employees, and thirty-one (31) non-driver employees. The Debtors seek to pay these terminated employees the same day as the next scheduled payroll day for Driver Group 2 Payroll. The Debtors in the exercise of their business judgment believe it is critical for the Debtors' continued operations to pay the terminated employees as proposed herein. The Debtors' remaining workforce is deeply impacted by the termination of a number of employees. If the remaining workforce should learn that the terminated employees will not be paid on a timely basis, there is very real risk that the remaining workforce will immediately seek employment elsewhere. For that reason the Debtors submit that paying the terminated employees on the November 25, 2022 payroll is in the best interest for the preservation of the value of the Debtors' estates.

**C.    THE PRE-PETITION WORKFORCE OBLIGATIONS**

32.    <u>U.S. Mail Payroll</u>.

a.    The next U.S. Mail Payroll is due on Tuesday, November 22, 2022, and covers the period from November 6, 2022, through November 12, 2022, all pre-petition days.

This payroll includes $47,577.07 in net wages, $17,054.95 in withheld taxes and employer paid taxes and $1,585.35 in garnishment payments. In addition, contributions to the 401(k) including employee deferrals are $3,538.23 and contributions for health and welfare plan premiums are $3,979.35. The Debtors are seeking authority to fund those amounts.

b.      The U.S. Mail Payroll for November 29, 2022, covers the period from November 13, 2022 through November 19, 2022, and will include five (5) pre-petition days, November 13-17, in combination with two (2) days of post-petition earnings.

This payroll is estimated to include approximately $47,500 in net wages, approximately $17,000 in withheld taxes and employer paid taxes, approximately $1,585 in garnishment payments, approximately $3,500 in contributions to the 401(k) plan, and $3,980 in contributions for health and welfare plan premiums.  The Debtors are seeking authority to fund those amounts on November 28, 2022.

33.    Driver Group 2 Payroll.

(a)      The next Driver Group 2 Payroll is due on Friday, November 25, 2022 and covers the period from November 13 through November 19 and will include five (5) pre-petition days, November 13-17, in combination with two (2) day of post-petition earnings.

This payroll includes approximately $112,800 in net wage payments, approximately $36,400.00 in withheld taxes and employer paid taxes, approximately $6,400 in contributions to the 401(k) plan, and approximately $7,800 in contributions for health and welfare premiums.  The Debtors are seeking authority to fund those amounts on November 23, 2022 on account of the bank holiday on November 24, 2022.

(b)      Additionally, the Debtors seek to include in the November 25, 2022 payroll the final payments to terminated employees that would otherwise be in the Non-Driver Payroll group.  This final payment to these terminated employees will include approximately $42,400 in net wages, approximately $13,250.00 in withheld taxes and employer paid taxes, approximately $4,000 in contributions to the 401(k) plan, and approximately $4,150 in contributions for health and welfare premiums associated with such payments.  The Debtors are seeking permission to fund those amounts on November 23, 2022, which is on Wednesday on account of the bank holiday on Thursday November 24, 2022.

34.    Non-Driver Payroll.

The next Non-Driver Payroll is due on December 2, 2022 and will include five (5) pre-petition days, November 13-17, in combination with nine (9) days of post-petition earnings.

The payroll is estimated to include approximately $201,640.00 in net wage payments, approximately $15,200 in withheld taxes and employer paid taxes, approximately $21,800 in contributions to the 401(k) plan, and approximately $23,500 in contributions for health and welfare premiums.  The Debtors are seeking permission to fund those amounts on December 1, 2022.

35.    While the Debtors do provide expense reimbursement for Employees who incur

charges for operating supplies, fuel, repairs and other expenses on the road for which other means

of payment are not available, the Debtors do not owe any Employees for expenses incurred pre-petition.

### D.    BASIS FOR RELIEF

36.    The Employees are an essential component of a successful bankruptcy.  Many of them live from paycheck to paycheck, relying exclusively on receiving their full compensation to pay their daily living expenses.  As a result, the Employees will be exposed to significant financial hardship if the Debtors are not permitted to honor the unpaid Pre-Petition Workforce Obligations, likely impairing workforce morale and welfare at this critical time.

37.    Amounts withheld from Employees' paychecks to be paid for specific purposes as designated by the Employees, or, in the case of garnishments, by judicial authorities, must be paid accordingly.  The failure to make these payments will result in hardship to certain Employees.  Moreover, if the Debtors are unable to remit certain of these amounts, the Employees could face legal action and/or imprisonment.

38.    In addition, to avoid the serious disruption of the Debtors' reorganization efforts that could result from the nonpayment of any withholding taxes, the Debtors seek authority to fund withholdings taxes, which is collected on behalf of the Employees to the applicable taxing authorities.  Many federal, state and local taxing authorities impose personal liability on the people in control of entities responsible for collecting taxes from employees to the extent any such taxes are collected but not remitted.  Thus, the Debtors' officers and directors may be held personally liable for the payroll taxes.  *See* 26 U.S.C. § 6672.  To the extent that any of the payroll taxes remain unpaid, the Debtors' officers and directors may be subject to collection efforts that would distract the Debtors and their officers and directors, to the detriment of all parties in interest in these chapter 11 cases.

39.    The termination of the employees on November 18, 2022, deepened the  worry and uncertainty of the remaining workforce whose confidence in the Debtors are already rattled by the Debtors' bankruptcy filing.  Under these circumstances, the Debtors must do everything possible

to preserve the trust and loyalty of the remaining workforce.  If the remaining workforce were to learn that the terminated employees must wait to be paid their final paycheck for an unknown period of time, and right before the Thanksgiving holidays, the Debtors are at risk of the remaining workforce losing all confidence in the Debtors and immediately look for other employment.  The Debtors' business is dependent on their fleet of trucks remaining on the road.  The loss of drivers would bring the Debtors' operations to a halt.  For that reason, the Debtors believe it is critical that the terminated employees be paid in order to save the Debtors' business and preserve the value of the estates.

## THE CRITICAL VENDOR MOTION

40.    By the Critical Vendor Motion, the Debtors respectfully request the entry of an order authorizing the Debtors to (1) pay the prepetition obligations owed to Comdata Inc. who provides the Debtors with corporate credit cards for fueling and for other corporate general use, (2) pay certain fines imposed by the City of LaPorte, Texas, against the Debtors' drivers personally for weight violations that were not due to any action on part of the drivers' and that constitute normal operational expenses of the Debtors' business.

**A.    COMDATA INC.**

**(i)    The Fuel Cards**

41.    As of the Petition Date, the Debtors' primary revenue source is generated from the deployment of its fleet of alternative fuel trucks and drivers providing transportation and logistics services for their customers, which include some of the largest companies in the country.  In the performance of this service, each of the drivers is issued two credit cards (collectively, the "Fuel Cards") used for re-fueling and other road related fees and charges such as oil and other engine fluids, lumper fees, towing, citations, and other items that need to be paid at the time of service.  The Fuel Cards are issued and maintained by Comdata Inc. ("Comdata").  One card is a Comdata branded proprietary card which is accepted at most major truck stops.  The other is a Comdata issued MasterCard branded fuel card which is necessary for use at

smaller truck stops which do not accept the Comdata branded proprietary card.  The Fuel Cards are corporate cards billed to NGL and not to the individual drivers.  NGL sets daily and transactional limits on these cards so that costs incurred on these cards are limited to costs necessary for the operation of its vehicles.

42.     Comdata invoices NGL on a daily basis for activity charged during the previous day. For example, charges incurred on a Monday are invoiced on Tuesday.  Payment is due seven days after the day a charge is incurred.  In other words, payment for charges incurred on a Monday would be due the next Monday.  In the ordinary course, NGL pays the Fuel Cards on a daily basis, on the due day of each invoice.

43.     As of the Petition Date, the outstanding unpaid charges on the Fuel Cards aggregate $102,640.41, which includes charges incurred from November 10, 2022, to November 17, 2002.[3]  The charges are billed under three separate Account Codes:  T-742, L-666, and L-41N.

44.     The Debtors cannot continue to operate their businesses without fuel and any disruption to the timely delivery of the customers' goods could be catastrophic to the Debtors' business, particularly as the holiday season has arrived.  The Debtors believe that Comdata will not allow the continued use of the Fuel Cards if the prepetition charges are not paid.  Therefore, the Debtors request that NGL be authorized to pay the prepetition invoices to Comdata in the aggregate amount of $102,604.41, plus any additional prepetition amounts that may be reflected on additional invoices received from Comdata.  Copies of the Fuel Card invoices are filed with the Witness and Exhibit List.

(ii)     **The Corporate Cards**

45.     Comdata is also the issuer of corporate MasterCard branded credit cards used by the Debtors' executive and administrative staff (the "Corporate Cards").  Unlike the Fuel Cards,

---

[3] The Debtors include as prepetition debt the charges made prior to the time of the filing of their bankruptcy petitions on November 17, 2022.

the Corporate Cards are used for purchases of replacement parts, fuel for company vehicles and toll road replenishments. The Corporate Cards are invoiced to NGV Global on Monday of each week covering the prior Monday – Sunday (7-day) period.  As of the Petition Date, the prepetition unpaid balance on the Corporate Cards is $53,168.08, consisting of charges of $32,878.58 for the period of November 7, 2022, to November 13, 2022, and $20,289.50 for the period of November 14, 2022, to November 17, 2022.    Copies of the Corporate Card invoices are filed with the Witness and Exhibit List.

46.    The Debtors are seeking authority to pay the pre-petition balance owed on the Corporate Cards for two reasons.  First, Comdata is the issuer of both the Fuel Cards and the Corporate Cards. The Debtors are concerned that nonpayment of the Corporate Cards' prepetition balance may result in Comdata terminating both the Corporate Cards and the Fuel Cards.  Second, Comdata has provided the Debtors a global credit limit of $200,000 for the Fuel Cards and Corporate Cards combined.  If charges reach the credit limit, no card authorization will be allowed unless Comdata agrees to extend the $200,000 global credit limit.  Consequently, if the prepetition balance on the Corporate Cards of approximately $53,000 is not paid, the Debtors will effectively be operating with a credit limit of $147,000 ($200,000 – $53,000) in the post-petition period.  On any given day, the outstanding balance on the Fuel Cards is approximately $90,000 to $100,000.  The Corporate Cards on any given day is in the range of $30,000 to $60,000.  Given these figures, a credit limit of $147,000 (instead of $200,000) would leave the Debtors little wiggle room if a few larger charges happen to be incurred in close proximity to one another or if Comdata reduces the global credit limit as a result of the Debtor's filing, and thus raising the risk that the credit limit may be reached and charge authorization denied.  A single day's disruption due to credit limit block would cause major delays for the Debtors' fleet and harm relationships with the customers, potentially strand drivers with no ability to fuel their trucks and damage the Debtor's reputation with its existing drivers.  For these reasons, the Debtors request the authority to pay the prepetition charges on the Corporate Cards

to avoid the risk of potential serious disruption to the Debtors' post-petition operations.

**B.**   **CITY OF LAPORTE FINES**

47.   As of the Petition Date, there are certain fines owed to the City of LaPorte, Texas. The fines resulted from the Debtors' trucks and cargo exceeding certain weight limits imposed by the city in connection with container movements serviced by NGL.  The fines are imposed against the drivers personally.  However, the drivers are not directly responsible for the fines as the weights of individual containers are not known at the time the containers are assigned to the driver.  In the ordinary course of business fines which are not directly related to actions on the part of the driver (i.e. speeding, other traffic violations) are treated as ordinary business expenses and the Debtors pay these fines directly to the city.

48.   Because the drivers are not directly responsible for the fines the Debtors seek to pay by this Motion, it is important to the Debtors that the drivers do not suffer any personal consequences as a result of the fines so that they may continue to do their jobs for the Debtors.

49.   As of the Petition Date, there are four outstanding citations issued by the City of LaPorte as follows:

| Date of Citation | Driver | Court Date | Violation | Fine Amount |
|---|---|---|---|---|
| 9/9/2022 | C. Johnson | 10/12/2022 | Overgross Weight | $1,891.00 |
| 11/17/2022 | C. Johnson | 10/12/2022 | Fail to appear in court | $374.00 |
| 10/21/2022 | C. Johnson | 11/30/2022 | Overgross Weight | $4,581.00 |
| 10/21/2022 | R. Leblanc | 11/30/2022 | Overweight Axle Group | $3,831.00 |
| | | | **TOTAL:** | **$10,677.00** |

Copies of the citations are filed with the Witness and Exhibit List.  The Debtors request the authority to pay the outstanding fines owed to the City of LaPorte so that the individual drivers are not held personally liable.

**C.**   **BASIS FOR RELIEF REQUESTED**

50.     the Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates. The preservation of key business relationships and minimization of the effects of the chapter 11 process on the end users of the Debtors' businesses are primary goals as the Debtors transitions into chapter 11 and prepare to restructure their debts through a plan of reorganization

51.     It is critical to the Debtors for the continued use of the Fuel Cards to keep the Debtors' fleet on the road servicing their customers.

52.     As stated above, Comdata has provided the Debtors with a global credit limit of $200,000 for the Fuel Cards and Corporate Cards combined.  The Debtors owe the aggregate of approximately $155,000 in prepetition charges on the Fuel Cards and Corporate Cards.  If the prepetition charges are not paid, the Debtors would be left with less than $50,000 credit limit to operate post-petition.  On any given day, the outstanding balance on the Fuel Cards is $100,000. The Debtors' cannot operate on a $50,000 credit limit.

53.     There is no practical option for the Debtors to seek out a different credit card company at this juncture, not without delays and undoubtedly on terms less favorable than the Comdata terms.  Due to the nature of the Debtors' business, any delay in their fleet's ability to remain on the road could be catastrophic to the Debtors' businesses, particularly as the holiday season is in full swing.

54.     With regard to the City of LaPorte fines, to expose the Debtors' drivers to personal liability for fines that are legitimately the Debtors business expenses would not only be inequitable but also would damage the Debtors' reputation with drivers, particularly as morale among the workforce is low at this time.  The loss of driver confidence would result in far more economic damages to the Debtors exceeding the amount of the fines outstanding.

55.     For the reasons stated above, the Debtors believe the payment of the pre-petition obligations to Comdata and the City of LaPorte is necessary and critical to avoid irreparable harm

that would result if the Debtors' trucks are stranded on the road without fuel and if the Debtors lose all credibility with their driver group.

## THE CASH COLLATERAL MOTION

56.     Pursuant to the Cash Collateral Motion, the Debtors seek emergency relief to use cash collateral in the operation of their businesses.  The Debtors have an urgent need to continue to use cash collateral on a daily basis to fund operational expenses, particularly payroll obligations and fuel costs.  Even a few days' interruption in funding could be detrimental for the Debtors' businesses.  The Debtors' drivers utilize fuel cards that are invoiced daily and are subject to daily and transactional limits.  The Debtors depend on access to fuel to cover transportation costs to continue operations and to get their drivers back home after deliveries.  The relief requested is critical to the Debtors' operations.  I believe that the continued use of cash collateral will preserve the Debtors' operations and the value of their assets to the collective benefit of all creditors and parties in interest.

## A.     PARTIES WITH AN INTEREST IN CASH COLLATERAL

57.     I am informed and believe that FirstCapital Bank of Texas, N.A. ("FCB") has an interest in Cash Collateral.  FCB's loans and security interests are generally described below, although the Debtors reserve the right to review and contest any secured creditors' claims and security interests.

## FirstCapital Bank of Texas, N.A.

58.     NGV Texas is obligated to FirstCapital Bank of Texas, N.A. ("FCB") pursuant to that certain Promissory Note dated June 21, 2019 in the original principal amount of $5,500,000 (as renewed, modified, amended or extended, the "First FCB Note").  The obligations under the First FCB Note are secured by a blanket lien in all assets of NGV Texas as provided by that certain Security Agreement between FCB and NGV Texas dated June 21, 2019.  The First FCB Note is

guaranteed by NGS pursuant to a Guaranty Agreement, which is secured by certain NGS inventory pursuant to a Security Agreement between FCB and NGS.  As of the Petition Date, NGV Texas was indebted to FCB pursuant to the First FCB Note in the approximate amount of $884,024.

59.     NGS is obligated to FCB pursuant to that certain Promissory Note dated February 5, 2020 in the original principal amount of $1,000,000 (as renewed, modified, amended or extended, the "Second FCB Note").  The obligations under the Second FCB Note are secured by a lien interest in certain equipment of NGV Texas as provided by that certain Security Agreement between FCB and NGS dated February 21, 2020.  The Second FCB Note is guaranteed by NGV Texas pursuant to a Guaranty Agreement dated February 21, 2020.  As of the Petition Date, NGS Texas was indebted to FCB pursuant to the Second FCB Note in the approximate amount of $522,000.

60.     NGS is obligated to FCB pursuant to that certain Promissory Note dated May 28, 2020 in the principal amount of $3,925,000 (as renewed, modified, amended or extended, the "Third FCB Note").  The obligations under the Third FCB Note are secured by a blanket lien in all personal property of NGS as provided by that certain Security Agreement between FCB and NGS dated May 28, 2020.  NGV Global, NGV Texas and NGL are obligated to FCB as guarantors of the Third FCB Note, and other indebtedness of NGS, pursuant to separate Guaranty Agreements, and each Guaranty Agreement is secured by blanket liens on the guarantors' personal property pursuant to a Security Agreement with FCB dated May 28, 2020.  As of the Petition Date, NGS was indebted to FCB pursuant to the Third FCB Note in the approximate amount of $2,280,821.

61.     NGS is obligated to FCB pursuant to that certain Promissory Note in the original principal amount of $1,387,752.91 (as renewed, modified, amended or extended, the "Fourth FCB Note").  As of the Petition Date, NGS was indebted to FCB pursuant to the Fourth FCB Note in the approximate amount of $996,609.

62.     NGV Global is obligated to FCB pursuant to that certain Promissory Note dated September 30, 2021, in the original principal amount of $1,870,760 (as renewed, modified, amended or extended, the "Fifth FCB Note", and together with the First FCB Note, the Second FCB Note, the Third FCB Note, the "FCB Notes").  The obligations under the Fifth FCB Note are secured by a blanket lien in all personal property of NGV Global as provided in that certain Security Agreement between FCB and NGV Global dated September 30, 2021.  As of the Petition Date, NGV Global was indebted to FCB pursuant to the Fifth FCB Note in the approximate amount of $1,661,633.

63.     The FCB Notes and related collateral are summarized on Debtors' Exhibit 6.  As reflected in Debtors' Exhibit 6, the Debtors are collectively obligated to FCB in the approximate amount of $6,345,117.  FCB's collateral includes first-lien interests in specific equipment, all of which is insured.  I estimate that the value of FCB's first-lien equipment collateral exceeds the amount of the Debtors' collective obligations to FCB, and as a result, FCB is adequately protected by its interest in the equipment collateral.

64.     As provided above and in the relevant loan documents, the FCB Notes are secured by various assets of the Debtors (the "FCB Prepetition Collateral"), including as applicable, the Debtors' cash and cash equivalents ("FCB Cash Collateral").

**Maplemark Bank**

65.     I understand that Maplemark Bank has offset the deposit account that it held as collateral, and as such, Maplemark Bank does not currently have an interest in Cash Collateral

**B.     BASIS FOR RELIEF REQUESTED**

66.     The relief requested in the Cash Collateral Motion is necessary to prevent immediate and irreparable harm to the Debtors' chapter 11 estates and should provide sufficient funds to permit the Companies to continue to operate their businesses, and to satisfy payroll, fuel costs and other operating expenses.

67.     I believe that the value of the Prepetition Collateral for each of the Lenders exceeds the indebtedness owed to each such Lenders as of the Petition Date and that the Prepetition Collateral will substantially retain its value during these Bankruptcy Cases.  I therefore believe each of the Lenders is adequately protected by equity in their Prepetition Collateral.  Nevertheless, to the extent of any diminution in value of each Lender's security interest in their Prepetition Collateral occasioned by the use of Cash Collateral, the Debtors propose to grant the Lenders replacement liens in such assets in the same order of priority as presently existing in the Prepetition Collateral.

68.     I believe that the relief requested in this Motion will provide the Lenders with adequate protection for the use of Cash Collateral.  The Debtors' continued use of Cash Collateral for operations will continue the going concern value of the Debtors' businesses and will maximize the position of all of the Debtors' creditors, including the Lenders.  In the course of operations, the Debtors will continue to transact business and generate and collect new receivables.  Such ongoing operations benefit the Lenders and all other creditors in that new accounts receivable will be created by the use of Cash Collateral.

69.     The Companies have no material source of ongoing income other than from operations and the collection of accounts receivable.  At the present time, an immediate and critical need exists for the Debtors to be permitted access to funds in order to continue the operation of their businesses, to pay fuel costs, payroll and other operating expenses, and to protect their ability to reorganize in accordance with chapter 11 of the Bankruptcy Code.

70.     In the Cash Collateral Motion, the Debtors request that the Court authorize and approve the Debtors' use of Cash Collateral for the payment of operating expenses in accordance with the Budget included with Debtors' Exhibits as Exhibit 1, and with subsequently approved budgets.  The Budget indicates periods of potential cash shortfalls.  This is largely due to payroll and overhead expenses of an affiliate non-debtor entity (NGV Administration) which are allocated

to the Debtors.  If such cash shortfalls occur during the Budget cycle, I anticipate that I or a non-debtor affiliate will provide funding to NGV Administration to cover such shortfalls.

71.     To remain in possession of their property, to continue their business activities, and to achieve a successful reorganization, the Debtors request use of Cash Collateral in the Debtors' ordinary business operations.  I believe that payment of operating expenses in accordance with the Budget is reasonable and that such payment is for necessary business expenses that must be paid in order to continue the Debtors' business operations.

72.     In the event the Court does not authorize the Debtors' proposed use of Cash Collateral, I believe that the Debtors will be unable to maintain their current business operations and to confirm a plan of reorganization as contemplated by the Bankruptcy Code.  Without the use of Cash Collateral, the Debtors will be seriously and irreparably harmed, resulting in significant losses to the Debtors' estates and their creditors.

73.     The Debtors request immediate authority to use the Cash Collateral to fund the Debtors' day-to-day operations.  Absent such relief, the Debtors will not be able to continue to operate their businesses.  In sum, failure to obtain authorization for the use of the Cash Collateral will be disastrous to the Debtors and their creditors.  Entry of an order authorizing the use of Cash Collateral will minimize disruption to the Debtors' business and operations and permit the Debtors to fund fuel costs, meet payroll and pay other operating expenses.  Absent use of the Cash Collateral, the Debtors' estates would not have sufficient funds to satisfy ongoing business obligations. I therefore believe allowing use of Cash Collateral is in the best interest of the Debtors' estates and each of their creditors.

[Remainder of page left intentionally blank]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 22, 2022

___/s/ Farroukh Zaidi_____
Farroukh Zaidi

L:\JPROSTOK\Natural Gas Logistics, Inc. (NGV Global) #6321 WO\Pleadings\Declaration in Support of First-day Motions 11.22.22 revised.docx